UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

NO. 6:09-CR-00016-2-DCR

UNITED STATES OF AMERICA                                                               PLAINTIFF

V.                              RECOMMENDED DISPOSITION

DOUGLAS C. ADAMS                                                                       DEFENDANT

\* \* \* \* \*

The Court addresses a motion to suppress filed on behalf of Defendant Douglas Adams. *See* DE #329. The United States responded in opposition, *see* DE #344, and the Court conducted a plenary evidentiary hearing. *See* DE #355 Minute Entry Order. At the hearing, both sides had a full opportunity to present proof and argument.

The Court recommends that the District Judge DENY the motion to suppress. The suppression effort is based on an alleged *Miranda* violation, but the statement Adams made, which the defense now seeks to suppress, was not the result of custodial *interrogation*. Adams was in custody, but he did not speak in response to improper questioning or its equivalent. As such, even without *Miranda* warnings, the voluntary statement is immune from suppression.

In this action, Adams, the Superintendent of the Clay County schools,[1] faces RICO conspiracy and money-laundering charges related to operation of the Clay County Board of Elections from 2002 to 2007. He seeks to suppress a March 19, 2009 post-arrest, but pre-*Miranda* statement allegedly made to Manchester Police Chief Jeff Culver. Culver, along with FBI agents, effected Adams's arrest on March 19 pursuant to a warrant from this Court.

---

[1] He was Superintendent at the time of indictment.

The lone witness at the hearing was Chief Culver. Both parties examined him extensively, and the Court recessed the hearing so that the United States could retrieve and provide Defendant with a copy of a statement by Culver related to the matters at issue. The defense received the statement and questioned Culver about it. Defendant Adams contemplated testifying, and the Court specifically announced that it would adhere to Fed. R. Evid. 104(d) concerning cross-examination limits, but the defense ultimately determined against calling Adams to the stand.

Because only Chief Culver testified, his testimony and the admitted records provide the only factual bases for decision. Per the hearing record, the Court notes:

-- Culver participated in arresting Adams at the Board of Education offices around 8:30 a.m. on March 19, 2009. Culver learned about the arrest sweep (involving all Co-Defendants in this case) on the evening prior, and the FBI employed eight members of the Manchester Police Department (MPD) for scene security, transport of prisoners to the processing center, and transport to London. Culver's department provided a "marked unit" presence for the day, and he repeatedly characterized the MPD role as security and transportation. *See* DE #393 Transcript ("Tr."), at 7-9.

-- Culver and FBI SA Timothy Briggs apprehended Adams without incident at the Board of Education offices. Culver saw Adams with a group in or around a meeting room, and he called Adams out into a hallway. Briggs then arrested Adams. No one provided Adams with *Miranda* warnings until later in the morning, after the statement at issue in the hearing occurred. *See id.* at 9.

-- Culver had no part in the FBI's decision to involve him in Adams's arrest. He had no familiarity with the Indictment in this case at the time of the arrest or during his

2

      interaction with Adams on that day. The FBI assigned Culver to Adams at the "last moment," *see id.* at 22, and Culver did not discuss with the FBI, prior to March 19, the depth or nature of any relationship he had with Adams. *See id.* at 24.

-- Culver described his relationship with Adams as "mostly professional." *See id.* at 14. He clearly had some level of personal relationship with Adams. Culver had twice been "frog gigging" in a group with Adams sometime between 2006 and 2007. *See id.* at 69. Further, Culver and Adams shared close mutual acquaintances and the men had eaten together in public and private settings. *See id.* at 74-75. Culver has been to Adams's home only once. *See id.* at 21. Culver has family members that worked either under Adams or in the County Clerk's office. *See id.* at 10-11.

-- In a semantic duel with defense counsel, Culver resisted characterizing Defendant as a close "friend" or agreeing that he had a "personal" connection to Adams, instead indicating that he viewed his connection as primarily business. *See, e.g., id.* at 74-77. He stressed that he and Adams may have been part of groups together, but that the men did not have a separate and distinct close personal friendship. Culver described professional interaction he has had with Adams through the years in Manchester. Culver agreed that Adams may perceive the two men as friends.

-- Culver alone transported Adams to FCI Manchester for processing. The FBI had arranged to use that facility to manage the large group of defendants. The ride to the prison was brief – about 2 miles. *See id.* at 40. While in transit, Culver "apologized" to Adams and remarked that the situation was "awkward" for the Manchester police. *See id.* at 10. Adams allegedly responded by saying "he understood." *See id.* The

situation was awkward, to Culver, because of the professional and family relationships present between local police and a large group of prominent defendants in a small county. *See id.* at 10-11. He said he spoke the words to break tension related to the arrest. *See id.* at 34.

-- At FCI Manchester, Culver and others continued to provide security in a large, makeshift booking area. The defendants were all in a main room, segregated from each other. Some of the defendants, Adams included, asked for permission to smoke. Culver received permission to allow smoking in the FCI smoking area, with the defendants under continuing segregation and monitoring. Still pre-*Miranda*, Culver escorted Adams to the smoking area and accompanied Defendant while he smoked. *See id.* at 11-13.

-- While Adams smoked, Culver at some point stated he'd "rather be frog gigging than us to be here under these circumstances." *See id.* at 13. He again stated that he spoke the words as a "tension breaker" or as a way to "pass the time." *See id.* Adams allegedly responded by saying, "I thought that the 2002 election was behind me. I did what I had to do."[2] *See* Government Exhibit 1; DE #393 Tr. at 14. **This is the statement now at issue.** Culver changed the subject after Adams made that statement, discussing his son's upcoming graduation with an education degree. Culver did alert the FBI to the statement when he returned Adams to the main room after Defendant finished smoking.

---

[2] Culver testified consistently with his written statement from March 19. *See* Government Exhibit 1.

4

-- Culver denied he had any intent to elicit an incriminating statement from Adams. *See id.* at 16. The FBI had not directed him to seek information (or forbidden him from doing so). The time between the arrest (at 8:30 a.m., *see* Defense Exhibit 1, FBI 302) and the statement (at about 10:00 a.m., *see* Government Exhibit 1,[3] Culver Statement) was 1.5 hours.

-- Culver admitted on cross that he had participated in a 2002 police investigation related to Adams's daughter. She apparently was involved with a person suspected of drug crimes, and Culver, with other police, had found the daughter and transported her to the police station. Culver had some interaction with Adams related to those events, but the witness described that interaction as wholly professional. *See* DE #393 Tr., at 25-29.

∗ ∗ ∗

*Analysis*

The case presents a narrow issue. Relative to the statement at issue, the Government concedes that a) Adams was in custody; and b) Adams had not received *Miranda* warnings. Thus, the lone question is whether Adams's statement regarding the 2002 election resulted from custodial *interrogation*. Defendant has the burden of establishing that custodial interrogation occurred. *See, e.g., United States v. Stuemke*, 493 F. Supp. 2d 990, 994 (S.D. Ohio 2006) (citing *United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161 (6th Cir. 1989) for proposition that "when a defendant

---

[3] Interestingly, the United States did not produce the Culver statement in discovery. This is consistent with treating the interaction producing the statement as non-interrogative. Rule 16 generally requires production if a statement results from interrogation. *See* FED. R. CRIM. P. 16(a)(1).

5

seeks to suppress his statements on the basis that he was not given *Miranda* warnings, he has the burden of proving . . . that he was entitled to those warnings, because he was subjected to a custodial interrogation"). Here, the proof essentially is undisputed as to the salient events of March 19.

The Supreme Court defined the interrogation arm of "custodial interrogation" in *Rhode Island v. Innis*, 100 S. Ct. 1682 (1980). *Miranda*, of course, requires observation of prophylactic protective measures in advance of custodial interrogation. *See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). *Innis* addressed the meaning of "interrogation" in the *Miranda* context. The Supreme Court held that interrogation extends both to "express questioning" and to "its functional equivalent." *See Innis*, 100 S. Ct. at 1689. The functional equivalent of express questioning is "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *See id.* at 1689-90. The intent of police is not irrelevant but is not paramount; the test focuses "primarily upon the perceptions of the suspect." *See id.* at 1690. *Innis* does not hold police accountable for "unforeseeable results," and the definition of interrogation extends "only to words or actions . . . that [police] *should have known* were reasonably likely to elicit an incriminating response." *See id.* (emphasis original).

Factually, *Innis* involved a suspect arrested for using a sawed-off shotgun to commit armed robbery and murder. Police arrested the suspect but did not find the weapon. In transit to the station, and post-*Miranda*, police in the squad car had a conversation within earshot of the suspect. The suspect had asserted his right to counsel, and police were not addressing him directly. However, the officers overtly discussed the community danger presented by a loaded shotgun and remarked, "there's a lot of handicapped children running around in this area, and God forbid one of them might

find a weapon with shells and they might hurt themselves." *See id.* at 1686. The suspect responded with incriminating statements regarding the firearm location.

The Supreme Court found that the discussion in the suspect's presence was not interrogation. Though the Court conceded that the discussion placed "subtle compulsion" on the suspect, the Court rejected the idea that the "offhand remarks" of police were sufficiently "evocative" toward the suspect. *See id.* at 1691. The Court refused to equate the "subtle compulsion" with interrogation, finding that the actions and words of the police were not "reasonably likely to elicit an incriminating response." *See id.*

Cases decided since *Innis* further define the interrogation boundary and instruct the Court's analysis. *See, e.g., Arizona v. Mauro*, 107 S. Ct. 1931, 1935 (1987) (rejecting notion that police, by permitting overtly monitored jail discussion between suspect and wife, interrogated suspect; the suspect made incriminating statements to wife in presence of police, but Court declined to label police actions as interrogation); *United States v. Hurst*, 228 F.3d 751, 759 (6th Cir. 2000) (rejecting *Innis* interrogation where suspect confronted with assertion, "'we've got good information on you'"); *United States v. Payne*, 954 F.2d 199, 201 (4th Cir. 1992) (analyzing confrontation of suspect by police with incriminating evidence – "'They found a gun at your house.'" The *Payne* Court rejected a categorical analysis regarding such confrontation, found the statement "innocuous," and determined that the confrontation "was not one that sought or required a response." *See id.* at 203.); *Cort v. Parke*, No. 88-5923, 1989 WL 47437, at *1-2 (6th Cir. May 9, 1989) (per curiam) (*Cort* rejected interrogation argument where defendant was in custody, and officers confronted defendant, pre-*Miranda*, with "'Look, you just stabbed a young man up [the] street, up here, and he's probably going to die.'" The Court described the interaction as simply police explaining

7

reasons for arrest; the Court rejected *Innis* interrogation.); *Tucker v. Warden, Ohio State Penitentiary*, 175 F. Supp. 2d 999, 1004 (S.D. Ohio 2001) (rejecting *Innis* interrogation finding where police made "'offhand remarks'" to suspect including statement, "'when this is all said and done, I'd like to hear about what happened that day'").

Adams plainly fails to establish interrogation under *Innis* and the post-*Innis* cases. The defense theory is that "Culver played upon his friendship with Adams to obtain statements by Adams about the case. Specifically, Culver acted as though he was on Adams' 'side' in the case, purporting to be sympathetic with Adams' cause and expressing reluctance to be involved in Adams' arrest." *See* DE #329-2 Supporting Memorandum, at 3. The defense contends that the cumulative effect of the circumstances resulted in improper and unwarned interrogation.

Culver did "apologize" to Adams and express the awkwardness created by the Manchester PD's arrest role on the date in question. Later, during a smoke break sought by Adams, Culver noted that he'd rather be "frog gigging" than be at the prison under the circumstances at issue. In response to the last comment, Adams made the alleged incriminating statement. However, on the facts presented and clear law, that statement simply did not result from interrogation.

Culver acted without intent to secure incriminating information. He testified to having no such intent, and the circumstances do not impugn his motives. He did not work to be paired with Adams, and the record does not indicate an intentional orchestration by the FBI. Further, the comments Culver made to Adams in no way touched on evidence, case-related allegations, charges, or guilt/innocence. Rather, Culver simply expressed his regret at the situation and the awkwardness the situation created because of familiarity between the Manchester PD and the area defendants.

Culver's sentiments were just that, sentiments. He yielded to the common human inability

8

to remain silent in the face of uncomfortable silence. *See* DE #393 Tr., at 13 (Culver noting that he made the "frog gigging" comment in order to "[j]ust sort of pass the time, as maybe a tension breaker or – you know, we had been frog gigging before in the past, and just to pass the time away"). While apologizing to a defendant seems unusual, Culver explained the peculiar circumstances behind the remark. Like the "frog gigging" comment, Culver expressed only that he wished he had not been tasked with the duty before him. The relationship between Culver and Adams had marginal personal components, but Culver hardly traded on his connections with Adams to gain information. Culver concocted no ploy or subterfuge to override Adams's will or circumvent *Miranda*.

Adams's response to Culver – referencing the election from 7 years prior – was not an objectively foreseeable response to the "frog gigging" reference or other interactions with Culver. Culver testified that Adams's response was "no great surprise," *see* DE #393 Tr., at 67; however, Culver did immediately change the subject because he "didn't want to talk about that [charges against Adams]." *See id.* at 60. No objective officer should have known that the discussion or situation was reasonably likely to elicit an incriminating response from Adams. No logical connection exists between Culver saying he'd rather be "frog gigging" and Adams referencing the 2002 election. No officer should perceive that Culver's statement would be reasonably likely to produce evidence in the case.

The defense likened the case to *Brewer v. Williams*, 97 S. Ct. 1232 (1977). *Brewer* is a Sixth Amendment case, not a Fifth Amendment case. *See Brewer*, 97 S. Ct. at 1239 (analyzing not under *Miranda* and Fifth Amendment but under Sixth Amendment); *Fellers v. United States*, 124 S. Ct. 1019, 1022-23 (2004) (noting that "we have expressly distinguished this standard [Sixth Amendment] from the Fifth Amendment custodial-interrogation standard"). Though *Brewer* shares

9

some language with the *Innis*-type inquiry, *Innis* itself stated it would be "erroneous" to suggest that "the definition of 'interrogation' under *Miranda* is informed by this Court's decision in *Brewer*[.]" *See Innis*, 100 S. Ct. at 1689 n.4 (citation omitted). *Brewer* involved the famous "Christian burial speech," a premeditated, designed, and deliberate effort by police to gain incriminating information from a defendant in violation of his Sixth Amendment rights. The *Brewer* Court called the actions there at issue even more effective than "formal" interrogation. *See Brewer*, 97 S. Ct. at 1240. Culver's conduct has no parallels to that of the police in *Brewer*.

It is not illegal for police to ease the tension for a suspect under arrest. The defense harshly criticizes Culver for making statements designed as "tension breakers," *see* DE #393 Tr., at 86-90, but the defense does not criticize Culver for arranging an opportunity for the defendants to smoke. *See id.* at 91. *Innis* forbids conduct police should know is likely to produce an incriminating response; *Innis* does not require that police act with sterility and dispassion toward persons in custody. The cases ensure that a defendant's voluntary remarks, whenever made, fall outside the *Miranda* boundary. If police conduct in *Innis*, *Mauro*, *Payne*, and *Cort* failed to qualify as interrogation,[4] then Culver's benign commentary, which was limited, brief, guilt-neutral, non-intensive, and casual, surely also fails. Adams faced no pressure or compulsion "beyond that inherent in custody itself." *See Innis*, 100 S. Ct. at 1689. Adams's statement to Culver was volunteered, and the motion to suppress should be DENIED.

---

[4] Defense counsel, tongue-in-cheek, distinguished *Innis*, etc., by saying the cases referenced got the analysis "wrong." *See* DE #393 Tr., at 95. However, the defense seemed to contend that **any** interaction between police and suspect, not normally associated with booking and processing, would be interrogation under *Innis*. This goes too far. *Innis* excepted words or actions "normally attendant to arrest and custody" from *Miranda*'s interrogation proscriptions **altogether**. *See Innis*, 100 S. Ct. at 1689. *Innis* would analyze any other "words or actions" under its objective interrogation test. *See id.*

10

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As defined by § 636(b)(1) and Fed. R. Crim. P. 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 19th day of August, 2009.

Signed By:
*Robert E. Wier*  REW
United States Magistrate Judge